IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

LUIS ARMANDO DELHORNO,

        Petitioner,                    No. CIV S-08-473 GEB CHS P

       vs.

BEN CURRY, Warden, et al.,

        Respondents.          FINDINGS AND RECOMMENDATIONS

_____/

## I.  INTRODUCTION

Petitioner Luis Armando Delhorno is a state prisoner proceeding pro se with an amended petition for writ of habeas corpus brought pursuant to 28 U.S.C. §2254.  Petitioner stands convicted in the Sacramento County Superior Court of various offenses in case 02F02916, for which he is currently serving a sentence of 15 years to life.  In the pending petition, petitioner challenges his convictions for second degree murder and vehicular manslaughter.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

The facts of petitioner's offenses were well summarized on direct appeal in the unpublished opinion of the California Court of Appeal, Third District, case C046032:

> Shortly after 1:00 p.m. on March 20, 2002, the victim, Lowell
> Tetrick, was riding his motorcycle southbound on Whitsett Drive
> in Sacramento when he encountered defendant driving his pickup

1

truck in the opposite direction.  Defendant had just turned onto Whitsett and was in the victim's lane of traffic approximately 104 feet away.  Defendant and the victim applied their brakes, and the victim lost control of the motorcycle.  It flipped over and slid on its side toward the truck.  The victim was separated from the motorcycle and he too slid toward the truck.  By the time the motorcycle and the truck reached each other, they had nearly come to a stop.  The victim came to rest just under the front of the truck, wedged between the truck and the motorcycle.

After a second or two, defendant started to drive the truck forward slowly.  The motorcycle, which was in front of the right side of the truck, was pushed out of the way.  However, the victim remained under the truck and was dragged along as the truck increased speed.  The victim was dragged for 243 feet before disengaging from behind the truck.  His helmet was scraped and gouged and was eventually pulled off his head.  Defendant sped away from the scene.

The victim suffered massive injuries, especially to his right side.  A skid mark of flesh and blood was found on the road between where the motorcycle and the victim came to rest.  The victim had a large scrape from his back over both hips and an abrasion over his right shoulder blade.  He had a large scrape over his left chest and hip.  Muscle had been torn away in the armpit area of his right side, and there was asphalt imbedded in this injury.  He had injuries to the back of his right arm and his legs, but the most severe injuries were to his head.  The right side of his face had been ground away, his right eyeball was gone, the bone of his skull had been ground down and the gray matter of his brain was exposed.  There were also injuries to the victim's ribs, spleen, sacroiliac joint, and pubic bone.

A nearby resident called 911 at 1:29 p.m. and police and fire department personnel arrived soon thereafter.  The victim was taken away, but his heart stopped before he reached the hospital.  The victim was pronounced dead at 1:52 p.m.

When defendant arrived home, he appeared shaken and scared and told his girlfriend he had hit something or somebody.  Defendant told her that the victim was under the truck and that he dragged him.  Defendant covered the back of his truck with a tarp.  The truck was later moved ot the home of a friend.  Defendant asked if he could leave it there because he was in trouble with the law and wanted to go to Mexico.  Later, an anonymous caller reported where the truck could be found and the identity of its owner.  The authorities found the truck and defendant was arrested.

(Lodged Doc. 3 at 2-3.)

1    Petitioner was charged with murder, vehicular manslaughter, failing to stop after

2  causing an accident, and driving without a valid license.  He pleaded no contest to failing to stop

3  after causing an accident and driving without a valid license, and was convicted by jury of

4  murder and vehicular manslaughter.  Petitioner was sentenced to an aggregate term of 15 years to

5  life.

6    On direct appeal, the California Court of Appeal, Third Appellate District,

7  affirmed judgment, and the California Supreme Court denied review.  Petitioner sought habeas

8  corpus relief in the state courts which was denied at all levels.

9  III.  PETITIONER'S CLAIMS

10    In the pending petition, petitioner claims that (A) the prosecutor committed

11  prejudicial misconduct when presenting the testimony of an expert witness, a portion of which

12  was previously undisclosed to the defense; (B) the trial court erred in denying petitioner's motion

13  for a mistrial based on the foregoing ground; (C) the prosecutor committed further misconduct

14  during closing arguments when he allegedly argued facts not in evidence and misstated the

15  applicable law; and (D) petitioner received ineffective assistance of counsel when his court

16  appointed attorney failed to raise the aforementioned claims on direct appeal.

17  IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

18    An application for writ of habeas corpus by a person in custody under judgment of

19  a state court can be granted only for violations of the Constitution or laws of the United States.

20  28 U.S.C. §2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v.*

21  *Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (*citing Engle v. Isaac*, 456 U.S. 107, 119 (1982)).

22  This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to,

23  the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Lindh v. Murphy*, 521

24  U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999).  Under

25  AEDPA, federal habeas corpus relief is not available for any claim decided on the merits in state

26  court proceedings unless the state court's adjudication of the claim:

3

1  (1) resulted in a decision that was contrary to, or involved an
   unreasonable application of, clearly established Federal law, as
2  determined by the Supreme Court of the United States; or

3  (2) resulted in a decision that was based on an unreasonable
   determination of the facts in light of the evidence presented in the
4  State court proceeding.

5  28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v.*

6  *Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

7  V.  DISCUSSION

8  A.  Prosecutorial Misconduct- Expert Testimony

9  Petitioner claims that the prosecutor failed to inform the defense that he would be

10  asking his collision reconstruction expert, Steven Walker, about sound or noise produced inside

11  the cab of petitioner's truck.  Petitioner contends that the prosecutor's actions violated the

12  Supreme Court's holding in *Brady v. Maryland*, 373 U.S. 83 (1963).  Petitioner further contends

13  that Walker's previously undisclosed testimony lessened the prosecution's burden of proof and

14  interfered with his right to the effective assistance of counsel, depriving him of a fair trial.

15  1.  Additional Facts

16  Walker testified at length on the morning of October 9, 2003 regarding his

17  findings at the scene of the collision.  (Reporter's Transcript ("RT")[1] at 759-95.)  After a lunch

18  break and the brief testimony of another witness taken out of order for scheduling reasons,

19  Walker resumed the stand.  (RT at 807.)  He opined that petitioner's truck was at or near a stop,

20  i.e., was traveling at less than five miles per hour, at the time of impact with the victim and the

21  motorcycle.  (RT at 810-12.)  He further opined that the victim's body separated from the

22  motorcycle, which was spun clockwise out of the way to its point of rest, while the victim was

23  captured at the front end of the truck and "pushed into compliance with the geometry of the

24  undercarriage of the truck."  (RT at 818-820.)

25

26  [1] Lodged document 13.

4

Walker described for the jury the "dynamics involved in the transmission of sound into the cabin of a vehicle." (RT at 825-28.) He explained, in part, that when a vehicle runs over an object, the noise vibrations are directed into the passenger compartment where they can be heard as well as sensed, tactilely (sic), through "the seat of your pants." (RT at 825-26.) He was further questioned, and responded, as follows:

Q:   Have you had a chance to listen to the engine noise while idling of the truck that is involved in this collision?

A:   I did it at lunch.

Q:   Can you describe that in terms of how loud it is, whether you think that would in any way interfere with the dynamic you're talking about?

A:   I think that it would not interfere with the dynamic. And the way I would characterize the noise is to describe levels. I suppose the fellow in the neighborhood that has the brand new truck that you can't hardly hear at all, it's louder than that. And then you have the guy that has the work truck that's been around for a while, it's not as obnoxious but it's louder than the brand new truck that just rolled off the assembly line. Then you got the kid down the street with the jalopy that's obnoxious and you know he's -- you know he or she is in the neighborhood. It's not as loud as that. It's kind of mid way. It wasn't remarkable such that you'd say oh, wow, that's -- break out the ticket book, that's a noisy truck.

Q:   What about the issue of would that type of road noise interfere with your ability to hear, for example, objects that are under the vehicle?

MR. DECKLER:        Well, objection. Can we approach?

THE COURT:          Yeah.

(Off-the-record discussion in chambers.)

THE COURT:          All right

Q:   (By MR. DUNDENSING) Officer, I guess to be more pointed, my question is, are we talking about apples and apples when we talk about road noise that's created by an object under an engine?

A:   The noise portion of it would be the same. The tactile

5

1        sensations would be different.

2     Q:    Okay.  Is it the case at all that I guess engine noise -- I mean
            just maybe I'm just drawing on personal experience, you
3           know, running over an object makes a certain type of noise
            that would seem to me at least to be --
4
            MR. DECKLER:        Judge --
5
            THE COURT:          Yeah.  Let's not get your view.
6
      Q:    Is there -- have you had the experience in your training and
7           experience that there are different types of noises associated
            with engine noise versus an obstruction under a vehicle?
8
      A:    Yes.  There are some things that announce -- like I said,
9           that are anomalous to your normal vehicle operation that
            announce that something else is going on, yes.
10
      Q:    Okay.  Knowing what you know about this particular case
11          where you have an adult male with a helmet on and
            knowing what you know about the truck, would you expect
12          a noise of that sort, of dragging, to be something that would
            be readily apparent to a person in the driver's compartment
13          -- in the passenger compartment of the vehicle?

14    A:    Yes.

15    Q:    And why is that?

16    A:    Well, one, it -- my inspection of the clothing and helmet
            and whatnot indicated some remarkable wear.  The injuries
17          that I observed in the photographs and described in the
            autopsy report described remarkable wear.  The injuries that
18          I observed in the photographs and described in the autopsy
            report described remarkable wear.  And the size of the -- of
19          Mr. Tetrick would have necessarily made contact to the
            undercarriage of the truck to bring that amplification
20          forward.  I think the -- a little more succinctly, it's just he
            was so large in comparison to the space underneath, I don't
21          see how you could miss knowing that he was there.

22          MR. DUNDENSING:         I have nothing further...

23    (RT at 826-28.)

24          Outside the presence of the jury, petitioner's attorney moved for a mistrial citing

25    the prosecution's suppression of the sound or noise evidence which was recently acquired during

26    the lunch break.  (RT at 838-39.)  In the alternative, counsel asserted that the portion of the

                                          6

1   testimony regarding sound should be stricken as not a proper subject for expert testimony.  (RT

2   at 847-850.)  Based on the defense's objection, a five day delay until the start of Walker's cross-

3   examination was afforded during which time the prosecution proceeded with other witnesses.

4   (RT at 829.)  The trial court denied the motion for mistrial, finding that no prejudice had ensued:

5        THE COURT:  Okay.  Well, I think I've heard both sides of the
     motion.  I'm not going to grant a mistrial.

6
     The people should have advised Mr. Deckler that they were- they
7        had obtained some evidence and the officer had obtained some
     evidence and would be testifying.  However, I don't view it as
8        sandbagging.  It's not a situation that the People had this in their
     back pocket for a week and concealed it.  It's something that may
9        well have arisen, although they might have done something more
     about it over the weekend, but it's something that appears to have
10       arisen because there was some extra time for the officer to go out
     and conduct this further inquiry.  So it's one of those
11       happenstances that occurs in a trial.

12       And while we want discovery to be effective, to assist both sides,
     on the other hand, a trial is an effort to organize and present
13       evidence, and sometimes things are discovered late in the game
     either through lack of planning or happenstance.  So new
14       developments do occur in a trial.  Every trial, no matter how well
     prepared it is, has some surprise in it, unintended or unplanned and
15       not through trickery.  So these things do happen.

16       The People should have alerted Mr. Deckler.  But if they had, and
     this gets to the issue of prejudice, if they had alerted him at 1:30
17       we would have had the same argument and the same one we had in
     chambers essentially, and I would have made the same ruling.  This
18       is recent evidence, just acquired by the People, they have not
     hidden it, and we're going to go ahead.  I would have ruled that
19       we're going to go ahead and hear it through adequate cross-
     examination.

20
     And of course I have afforded this opportunity to delay the
21       commencement of cross-examination and the fact we have a nice
     break here so that there will be adequate cross-examination.  There
22       will be time for Mr. Deckler's expert to examine the vehicle or
     listen to it, and so I think the issue can be responded to and
23       effectively addressed when we get there next week.

24       So if it turns out that I'm persuaded ultimately that the procedure
     has handicapped the defense, the court can always advise the jurors
25       of late notice and the possible effects on the defense in responding
     to it, which are the preferred ways of dealing with these problems
26       if an admonition is necessary.  So that lies in the future.  I do not -

1    as I say, there's no factual basis for a mistrial, and that I believe
2    Mr. Deckler will be in a position to respond.

3  (RT at 843-45.)  The trial judge concluded, "And as I say, I find no prejudice at this point, and if

4  some develops, there are remedies that I think would be appropriate... if that becomes necessary."

5  (RT at 847.)

6          Trial reconvened after the defense's expert, Lawrence Henry Neuman, listened to

7  the engine of petitioner's truck and formed his own opinions.  The defense withdrew on tactical

8  grounds the motion to strike Walker's testimony, opting instead to fully cross-examine him and

9  present Neuman's additional expert testimony on the subject.  (RT at 901-902, 904.)  Neuman, a

10  consulting engineer, questioned some of Newman's opinions and opined himself that a layperson

11  in petitioner's truck would not be able to immediately distinguish the sound of a body being

12  dragged from the sound of something else, for example, a fender, being dragged.  (RT at 1004-

13  1006.)

14          2.      Analysis of the Claim

15          The standard of review for a claim of prosecutorial misconduct on writ of habeas

16  corpus is the narrow one of due process.  *Darden v. Wainwright*, 477, U.S. 168, 181 (1986).  A

17  prosecutor's error or misconduct does not, per se, violate a petitioner's constitutional rights.  *See*

18  *Jeffries v. Blodgett*, 5 F.3d 1180, 1191 (citing *Darden*, 477 U.S. at 181 and *Campbell v.*

19  *Kincheloe*, 829 F.2d 1453, 1457 (9th Cir. 1987)).  A criminal defendant's due process rights are

20  violated only if the error or misconduct renders the trial fundamentally unfair.  *Darden*, 477 U.S.

21  at 181.  Relief is limited to cases in which the petitioner can establish that the misconduct

22  resulted in actual prejudice.  *Johnson v. Sublett*, 63 F.3d 926, 930 (1995) (citing *Brecht v.*

23  *Abrahamson*, 507 U.S. 619, 637-38).  Put another way, prosecutorial misconduct violates due

24  process when it has a substantial and injurious effect or influence in determining the jury's

25  verdict.  *See Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 899 (9th Cir. 1996).

26  /////

1    In this case, the prosecutor's failure to advise the defense of sound evidence

2  which was newly acquired during a lunch break at trial may have constituted error, however, as

3  indicated by the trial judge, such error does not rise to the level of a due process violation.

4  Petitioner cannot establish that the alleged misconduct resulted in actual prejudice.  Even if the

5  prosecutor had immediately advised petitioner's attorney of his intent to elicit the testimony at

6  issue, any attempt by the defense to keep the testimony out would have failed.  The trial judge

7  clearly indicated that in this event the evidence would have still come in:

8         we would have had the same argument and the same one we had in
       chambers essentially, and I would have made the same ruling.  This
9         is recent evidence, just acquired by the People, they have not
       hidden it, and we're going to go ahead.  I would have ruled that
10       we're going to go ahead and hear it through adequate cross-
       examination.

11

12  (RT at 844.)  Moreover, the defense was not prejudiced by the "surprise" nature of the evidence

13  since the judge afforded a five day delay to prepare for Walker's cross-examination.  The delay

14  also allowed the defense sufficient time to obtain and present contrary opinions on the same

15  subject from Neuman, it's own expert witness.  Under these circumstances, the prosecutor's

16  failure to disclose the newly acquired sound evidence immediately before Walker testified did

17  not have a substantial and injurious effect or influence in determining the jury's verdict.

18    Nor did the prosecution's presentation of Walker's previously undisclosed

19  testimony constitute a *Brady* error.  In *Brady v. Maryland*, the United States Supreme Court held

20  that the suppression before trial of requested evidence favorable to an accused violates due

21  process where the evidence is material either to guilt or to punishment, irrespective of the good

22  faith or bad faith of the prosecution.  373 U.S. 83 (1963).  In the *Brady* context, evidence is

23  material if there is a reasonable probability that, had it been disclosed to the defense, the result of

24  the proceeding would have been different.  *Kyles*, 514 U.S. 419, 433-34 (1995).  The relevant

25  question is whether, in the absence of the information, petitioner received a fair trial resulting in

26  a verdict worthy of confidence.  *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).  In this case, the

1   previously undisclosed testimony of Steven Walker was not "material" for purposes of a *Brady*

2   claim because it was not favorable to petitioner's case.

3           Petitioner further asserts that the prosecutor's alleged misconduct somehow

4   interfered with his right to the effective assistance of counsel, thereby lessening the prosecution's

5   burden of proof:

6           It is petitioner's belief that the prosecutor's objective was to
        sabotage his defense, deprive him of the effective assistance of
7           counsel; thereby shift the burden of proof to the accused/petitioner,
        or simply put, lessen-the-necessary burden of proof.

8

9   (Petition at 4.)

10          The Due Process Clause of the Fourteenth amendment "protects the accused

11  against conviction except upon proof beyond a reasonable doubt of every fact necessary to

12  constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970).  Here,

13  petitioner appears to contend that Walker's "surprise" testimony somehow lessened the

14  prosecution's burden of proof regarding whether petitioner acted purposely or knowingly.

15  Walker's testimony did not, however, relieve the People's burden of proving beyond a reasonable

16  doubt any necessary fact.  The jury was free to consider and accept or reject Walker's testimony,

17  just as it was free to consider and accept or reject any testimony of the defense's expert, Neuman,

18  on the same subject.  The admission of Walker's testimony did not constitute a *Winship* error.

19          Petitioner also asserts that the prosecutor's alleged misconduct interfered with his

20  right to the effective assistance of counsel because his attorney had no reason to believe that he

21  would be required to defend such evidence.  Again, however, the trial judge emphatically

22  indicated that any objection to the newly discovered evidence would have been overruled, and

23  petitioner's counsel was afforded a five day delay to prepare his own expert and to prepare for

24  Walker's cross-examination.  Even assuming that a colorable claim of ineffective assistance of

25  counsel could be brought based solely on conduct of the prosecutor as opposed to alleged

26  deficiencies in defense counsel's performance, petitioner would again not be able to demonstrate

the required element of actual prejudice.  *See Strickland v. Washington*, 466 U.S. 668, 694 (1984).  There is simply no reasonable probability that the result of the proceeding would have been different had the sound evidence been immediately disclosed to the defense.  Petitioner is not entitled to relief for his claim of prosecutorial misconduct in relation to the testimony of Steven Walker.

B.      Denial of the Motion for Mistrial

Petitioner claims alternatively that the trial court erred in denying his motion for a mistrial based on the foregoing ground.  The gravamen of petitioner's complaint is that the admission of Walker's testimony about sound was so prejudicial that it rendered his trial fundamentally unfair and warranted a mistrial.

Petitioner appears to argue in this claim that Walker's testimony was improperly admitted.  To the extent petitioner claims that Walker's sound evidence was improperly allowed into evidence under state law, his claim is not cognizable here.  *See Estelle v. McGuire*, 502 U.S. 62, 68 (1991).  A state court's evidentiary ruling is grounds for federal habeas corpus relief only if it rendered the state proceeding so fundamentally unfair as to violate due process.  *Id*.; *Bueno v. Hallahan*, 988 F.2d 86, 87 (9th Cir. 1993).  Although petitioner maintains that Walker's sound testimony was improper, his main complaint with it seems to be the nature in which it surprised the defense.  As set forth above, the defense was afforded a five day delay before cross-examining Walker due to the element of surprise.  The defense's contemporaneous objection to the evidence was ultimately withdrawn so that it could present the testimony of its own expert on the same subject.  The admission of Walker's "surprise" testimony on sound did not render petitioner's trial so fundamentally unfair as to violate due process.  Accordingly, there can be no relief for the trial court's alleged error in denying the motion for mistrial.

/////

/////

/////

C.      Prosecutorial Misconduct- Closing Arguments

Petitioner claims that the prosecutor committed further misconduct during his closing argument.[2]  In this confusing claim, petitioner begins by rehashing some of the arguments already reviewed and rejected in subsections (A) and (B).  Because Walker's "surprise" testimony was allegedly improper, as petitioner claimed in the foregoing grounds, the prosecutor's reliance on it in closing arguments was also improper, he contends.  In addition, petitioner repeatedly asserts that the prosecutor "misstated" the evidence and appears to take issue with the inferences that the prosecutor urged the jury to draw from the evidence, including, for example, that petitioner "knew" the victim lay under his truck as he drove forward. Petitioner's claim in this regard has been thoroughly reviewed, however, his allegations about the prosecutor's misconduct during closing argument are not clear.

Petitioner points out that the primary question before the jurors as to the second degree murder charge was whether he had knowledge that the victim lay in front of or underneath the truck as he proceeded forward.  He appears to assert that the prosecutor thus improperly argued that he did, in fact, have such knowledge.  He complains, for example, that the prosecutor referred to portions of Walker's testimony with which the defense expert Neuman did not agree. He also complains that his attorney was not allowed to elicit an opinion from Neuman regarding whether petitioner knew that the victim was underneath his truck.  During Neuman's testimony, the prosecutor's objection to the speculative nature of this question was sustained.  This does not preclude the prosecutor from asserting, during his closing argument, that petitioner did in fact have the requisite knowledge.  Importantly, the prosecutor's remarks of which petitioner complains were made in argument, and not during presentation of the evidence in this case.

---

[2] Petitioner failed to make a contemporaneous objection at trial to any of the prosecutor's alleged improper remarks during closing argument.  Nevertheless, the claim does not appear to be procedurally defaulted since the state court denied this claim without comment, presumably on the merits. (Lodged document 11.)  *See generally Vansickel v. White*, 166 F.3d 953, 957 (9th Cir. 1999) (noting that federal habeas review is barred where petitioner has defaulted his federal claim in state court pursuant to an adequate and independent state procedural rule).

1   Petitioner also takes issue with the prosecutor's characterization of Walker's sound evidence and

2   petitioner's interview with law enforcement.  Petitioner has not shown, however, an instance

3   where the prosecutor actually "misstated" the evidence; rather, petitioner appears to disagree with

4   the inferences which the prosecutor argued could be drawn from Walker's testimony and

5   petitioner's statements.

6              Petitioner further complains specifically of the portion of the prosecutor's closing

7   argument set forth in the reporter's transcript at pages 1296-1300.  Nothing objectionable is

8   apparent, however, in the referenced portion or any other portion of the prosecutor's closing

9   argument.  In sum, petitioner has failed to demonstrate that the prosecutor made any

10  objectionable comments during closing arguments, let alone any comments that so infected the

11  trial with unfairness as to make the resulting conviction a denial of due process.  *Darden v.*

12  *Wainwright*, 477 U.S. at 181.

13             D.      Ineffective Assistance of Counsel on Appeal

14             For his final claim, petitioner alleges that he received ineffective assistance of

15  counsel on direct appeal.  A showing of ineffective assistance of counsel has two components.

16  First it must be shown that, considering all the circumstances, counsel's performance fell below

17  an objective standard of reasonableness.  *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).

18  In assessing an ineffective assistance of counsel claim, "[t]here is a strong presumption that

19  counsel's performance falls within the 'wide range of professional assistance,'" *Kimmelman v.*

20  *Morrison*, 477 U.S. 365, 381 (1986) (*quoting Strickland*, 466 U.S. at 689), and that counsel

21  "exercised acceptable professional judgment in all significant decisions made." *Hughes v. Borg*,

22  898 F.2d 695, 702 (9th Cir. 1990) (*citing Strickland*, 466 U.S. at 689).

23             The second factor required for a showing of ineffective assistance of counsel is

24  actual prejudice caused by the deficient performance.  *Strickland*, 466 U.S. at 693-94.  Prejudice

25  may be found where "there is a reasonable probability that, but for counsel's unprofessional

26  errors, the result of the proceeding would have been different." *Id*. at 694.

1         The *Strickland* standards apply to appellate counsel. *Smith v. Murray*, 477 U.S.

2    527, 535-36 (1986); *Miller v. Keeney*, 882 F.2d 1428, 1433 (9th Cir. 1989). An indigent

3    defendant, however, "does not have a constitutional right to compel appointed counsel to press

4    nonfrivolous points requested by the client, if counsel, as a matter of professional judgment,

5    decides not to present those points." *Jones v. Barnes*, 463 U.S. 745, 751 (1983). Appellate

6    counsel "must be allowed to decide what issues are to be pressed." *Id*. There is no obligation to

7    raise meritless or weak arguments on a client's behalf. *Miller*, 882 F.2d at 1434; *see also*

8    *Strickland*, 466 U.S. at 687-88 (requiring a showing of deficient performance as well as

9    prejudice).

10        Petitioner claims that his state-appointed appellate counsel failed to raise on direct

11   appeal the grounds addressed in the preceding subsections. As set forth above, however,

12   petitioner's claims brought in the pending petition are clearly without merit and appellate counsel

13   was thus not ineffective in failing to raise them on direct appeal.

14                        VI.  CONCLUSION

15        For all the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's

16   application for writ of habeas corpus be DENIED.

17        These findings and recommendations are submitted to the United States District

18   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty

19   days after being served with these findings and recommendations, any party may file written

20   objections with the court and serve a copy on all parties. Such a document should be captioned

21   "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections

22   shall be served and filed within ten days after service of the objections. The parties are advised

23   that failure to file objections within the specified time may waive the right to appeal the District

24   Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

25   DATED: February 5, 2010

26                                                       _Charlene H. Sorrentino_
     CHARLENE H. SORRENTINO
     UNITED STATES MAGISTRATE JUDGE